STATE OF MAINE. *vs.* MYRTIE M. DORE.

Somerset.    Opinion December 25, 1922.

*A verdict of guilty to stand if the evidence consistently compels such a conclusion, being inconsistent with any reasonable hypothesis of the respondent's innocence.*

Where, as in this case, the facts and circumstances in evidence demonstrate the inconsistency of any reasonable hypothesis of a respondent's innocence and consistently prove the latter's guilt to a moral certainty, the requirement of the law is met, and a conviction for the commission of crime is justified.

On appeal. Upon an indictment for manslaughter the respondent was tried by a jury and convicted, and from the refusal of the presiding Justice to grant a motion for a new trial, an appeal was taken. Appeal dismissed. Judgment for the State.

The case is sufficiently stated in the opinion.

*James H. Thorne, County Attorney,* for the State.

*Percy A. Smith and George W. Gower,* for the respondent.

SITTING: CORNISH, C. J., SPEAR, DUNN, WILSON, DEASY, JJ.

DUNN, J. Beatrice Dore, aged sixteen years and single, died on September 18, 1921, sepsis or organic contamination following a criminal abortion being the cause. The government, suspecting the girl's mother of the producing deed, caused an indictment for manslaughter to be returned, and the mother was convicted. Against the propriety of that conviction she addressed a motion to the Justice presiding at the trial, and from an adverse decision made this appeal. The appeal is unsupported on the record.

The facts and circumstances shown were these, in brief: One day two weeks or so previous to that of the alleged crime the respondent asked a neighbor if she knew a doctor "who would help" a friend of hers "out of trouble," and the neighbor said that she did not. A niece of the respondent testified that she had told the respondent, several weeks before that time, that Beatrice was pregnant. Denying that she then had knowledge of the pregnancy, and insisting that the inquiry was without relation to her daughter, Mrs. Dore said that she questioned the neighbor because of something that her own mother had said.

Mrs. Olive Stevens witnessed that while she was at the Dores, on September 12th or 13th, Mrs. Dore said to Beatrice, in the hearing of the witness, that she had "disgraced  . . . .  the whole of us,  . . . .  ought to be horsewhipped, and would be sent to a hospital to be operated upon." The respondent disputed the making of any such statement, saying further that Mrs. Stevens had not been at her house within two months of the day that the latter fixed. But what Mrs. Stevens said had some circumstantial corroboration. Mr. Percy Richardson roomed in a house next to the Dore home, the open space or distance from the window in his room to a window in Beatrice's being but five or six feet. He knew the Dores. He testified that, three or four nights before that which was the last that Beatrice lived at home, while he was in his room and she in hers, he heard the girl's mother say: "You will disgrace the whole family, and you are not going to do it. I am going to have a doctor and see, that's what your father would say." "And," continued the witness, "then I couldn't understand just what she said, and I thought the girl was crying." The force of the testimonies of Mrs. Stevens and Mr. Richardson is not entirely in indirect reciprocal support, as will appear later.

Coming to the last night at home, another niece of Mrs. Dore's, this one living with her, testified that as Beatrice was on the way upstairs to bed her mother said: ''I am coming into your room in a few minutes.'' And Beatrice replied: "No, you ain't; I ain't going to have people in my room.'' And the mother rejoined: ''Yes, I am!'' In the night, between two and three of the clock, Beatrice shrieked. And the witness heard the mother saying: "Keep still, they will hear you over to Shorey's!'' And Beatrice sobbed and moaned: "Oh, mamma, it pains!'' Mr. Richardson, the man in the nearby house, gave evidence that he heard Beatrice's exclamations indicative of suffering, sounding ''as though somebody was all in despair.'' Other persons who were in the same house as he said that they heard no exclamation. And a man who had been in the street in the vicinity of the Dore place, but who had gone away before the time named by the other witnesses, said that he heard no noise in that house while he was about.

Excluding the possibility of the performance of the abortive act by a third person, Mrs. Dore said that her daughter's early morning outcry awakened her; that on going to the girl's room she found her in evident pain; and that she took her to a rear room on the first floor of the house, where she put her into a bed. After dressing herself completely, the respondent kindled a fire in a stove and, when water and a flatiron had heated, she gave the girl attention. Stepping to the yard she called to her son, who was sleeping in the house where Richardson was rooming, to hurry a call for Dr. Wilson to come to Beatrice in her "awful sickness.'' The young man reported that he was informed that the doctor was away from town for a month. Then, he was directed to hasten and bring his grandmother from her home a quarter of a mile away, and thence speed the automobile to a neighboring town for a doctor located there. He brought grandmother and the physician for whom he went came. To the doctor Mrs. Dore proffered explanation that Beatrice, being four months advanced in the period of pregnancy, had secretly arrested gestation. The girl herself, on the authority of the doctor, said that she had ''been using a syringe, and this is the first time I have got any water up in the womb.'' The evidence of what the girl said was advanced, not as a dying declaration, but as a mere inquiry answering statement. No question touching the admissibility of the statement was suggested. Elsewhere similar statements have been excluded as

hearsay. *Com.* v. *Sinclair,* 195 Mass., 100; *Hays* v. *State,* 40 Md., 633; *People* v. *Davis,* 56 N. Y., 95; *Rex* v. *Thompson,* 3 K. B., 19. Ann. Cases, 1913A, 530. Being received without objection, what the girl is quoted as having said, weighs on review for its worth, as seemingly it weighed at the trial.

Later in the day Beatrice was removed to a hospital. There was evidence, again in the absence of objection, that she told at the hospital that, to prevent a child being born alive, she had injected water into her womb by means of a syringe. The fetus was expelled in the afternoon of the day of the girl's arrival at the hospital. Beatrice died about four o'clock the next morning. On the third day her body was exhumed. An anatomical examination revealed that Beatrice's life ended, following septicemia and attendant peritonitis, after a blunt instrument, at least nine inches in length, had been passed into her womb, and forced through the right side of its upper wall. Peritonitis, it is familiar medicolegal knowledge, is frequent in cases of instrumental violence. The perforating wound, which subsequent contracting of the uterus may have enlarged, was irregular in outline and of a size to admit a forefinger; it had been sealed by the placenta or afterbirth. There was a slight abrasion on the vagina near the womb's neck. Nothing indicative of other disposing or operative cause was disclosed.

Of course, the doctors could not absolutely define the perforation as attributable to a criminal operation. A witness testifying with great mental conviction may hesitate to swear that the fact could not possibly be otherwise than as he stated. Asking a person whether he will "swear" that his judgment or opinion is errorless is a kind of menacing question put at odd times, usually with emphasis in last resort, on cross-examination.

The government introduced a rubber bag of about a two-quart capacity, having a flexible rubber tube with a small hardened rubber nozzle attached, the tube being one-quarter inch in diameter and more than five and one-half feet in length, and the nozzle two and one-half inches long. Respondent said that this rubber bag and its appendages was a gravity or fountain syringe which Beatrice had had. The weight of the medical testimony clearly maintained that the syringe nozzle, at the end of the tubing, was too short to have reached to the womb's wall and caused injury. Also, that while a sufficient quantity of water introduced into a womb might precipitate labor

pains, it could not lacerate. The defense introduced a slender screw-driver, measuring eleven and five-eighths inches over all; the blade being six and one-half inches long. Mr. Dore, the husband and father, who was away from home on the night that the doctor was called, said that he found the screw-driver on the floor at the back side of her bed the day after his daughter's death. He kept the finding a secret, notwithstanding the searching of his house by the public authorities, until the respondent was held to bail; meanwhile using the implement about an automobile. The doctors were in substantial agreement that the screw-driver could have caused the injury. It would be difficult, if not impossible, said they for any woman, and especially one of unpracticed and unskilled hand, to pass an instrument into her own uterus, the neck being virtually in a virginal state, as was Beatrice's. Moreover, in the case of a self-insertion, the nervous sensation which contact with the wall would ·cause, would warn an operator to cease. On the other hand, if one person were employing mechanical means on another he could not be so guided, although the other was most willingly accessory.

The suggestion of a spontaneous rupture, assignable to the carrying of a child by Beatrice thirty-six hours previously, was too remote. A rupture due to natural causes manifests itself promptly. Assuming a rupture of that kind, with nature arresting damage by sealing the wound, a resulting hemorrhage through the cervical canal would be expected; whereas, a digital examination by the physician, as this girl was in bed at home, negatived the delivery of blood.

It would be at variance with recorded experience, as the defense asserts, for germicidal infection to develop and cause death within approximately twenty-four hours. This proposition is advanced as entitling the respondent to remain in the citadel of a reasonable doubt. But it encounters the insurmountable barrier that the government was not so limited in time. Mrs. Stevens testified that she heard the girl's mother say, not on the last night that the girl lived at home, but on one day four or five before the day of that night, that there must be an operation. And Mr. Richardson evidenced that he heard the mother talking and Beatrice crying three or four nights previously. The inference was warranted that it was on that night that the respondent, despairing of getting anyone else to do it, manipulated and operated to bring on her daughter's menstrual courses. The defense furnished testimony that injuring a womb's

wall would tend to retard the beginning of a uterine expulsion. Whether there was a second operation pending reaction from the first was, in a sense, inconsequential. There was room for believing that the crime was committed on the night that Mr. Richardson heard Beatrice crying, and that on the later night the girl was groaning in labor; "Oh mamma, it pains!" In the interval of three or four days blood poisoning and its dread concomitant, peritoneal inflamation, had opportunity for development to deadly degree.

The girl's statement of the use of a syringe may be reconciled easily. Unexpected and unappreciated inactivity attending the mother's effort to abort, the girl believed, albeit erroneously, that what the mother did would not accomplish the desired result, and that what she herself had done, in the desperateness of her condition, had provoked her suffering.

There was other evidence; evidence of conflicting statements by the respondent concerning the first time that she acquired a certainty of her daughter's pregnancy; evidence of a household remedy or decoction of pennyroyal and tansy tea brewing upon the stove, by suggestion as an abortifacient; and still other evidence both for and against the State's contention. But that which has been set out at more or less length in this opinion comprised the essential substance of the testimony at the trial. The jury accepted the facts as demonstrating the inconsistency of any reasonable hypothesis of the respondent's innocence, and as proving her guilt to a moral certainty, consistently. The circumstances led where truth was hid.

*Appeal dismissed.*
*Judgment for the State.*